**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 12-cv-03217-MSK

**MICHAEL S. ROBERTSON,**

      **Plaintiff,**

**v.**

**CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration,**

      **Defendant.**

---

### OPINION and ORDER

---

**THIS MATTER** comes before the Court on Plaintiff  Michael S. Robertson's appeal of

the Commissioner of Social Security's final decision denying his application for Disability

Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and

Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-

83c.  Having considered the pleadings and the record, the Court

      **FINDS** and **CONCLUDES**

**I.**      **Jurisdiction**

      Mr. Robertson filed a claim for disability insurance benefits pursuant to Titles II and

XVI, asserting that his disability began on September 8, 2011.  After his claim was initially

denied, Mr. Robertson filed a written request for a hearing before an Administrative Law Judge

("ALJ").  This request was granted and a hearing was held on July 24, 2012.

      The ALJ issued a decision which found that Mr. Marquez met the insured status

requirements through December 31, 2016.  Applying the five-step disability evaluation process,

the Decision also found: at Step 1 that Mr. Robertson had not engaged in substantial gainful activity since September 8, 2011; at Step 2 that he had two severe impairments, degenerative changes of the thoracic and lumbar spine and right chondromalacia patella; at Step 3 that he did not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpt. P, Appx. 1 ("the Listings"); and that Mr. Robertson had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567 and 416.967[1] with the following additional limitations: he was able to lift no more than 40 pounds occasionally and 20 pounds frequently; stand and walk no more than 4 hours during an 8 hour workday; occasionally climb ladders and stairs, stoop, kneel, crouch, bend at the waist or squat; and he should not be exposed to extremely wet or cold environmental conditions in the workplace.  Given the above RFC, the Decision found at Step 4 that Mr. Robertson could not perform his past work.  However, at Step 5 the Decision found that he was not disabled because he was capable of performing other jobs that existed in the national economy, including telemarketer, appointment clerk and information clerk.

The Appeals Council denied Mr. Robertson's request for review of the Decision. Consequently, the Decision is the Commissioner's final decision for purposes of judicial review. *Krauser v. Astrue*, 638 F.3d 1324, 1327 (10th Cir. 2011).  Mr. Robertson's appeal was timely brought, and this Court exercises jurisdiction to review the Commissioner of Social Security's final decision pursuant to 42 U.S.C. § 405(g).

**II.   Material Facts**

The material facts are as follows.

---

[1] All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition.  Hereafter, the Court will only cite the pertinent Title II regulations governing disability insurance benefits, found at 20 C.F.R. Part 404.  The corresponding regulations governing supplemental security income under Title XVI, which are substantively the same, are found at 20 C.F.R. Part 416.

Mr. Robertson was born in 1984 and has a 12th grade education.  He served in the Navy from August 2003 to August 2007 and in the Army from March 2008 to September 2011 working as an aviation boatswain's mate, cook and general laborer.  He suffers from herniated and bulging disks in his spine, bone spurs in his knees and an adjustment disorder.

### A.  Back Pain

Primary among Mr. Robertson's physical complaints is his back pain.  He injured his back while working in 2004 and 2005, however, the first documentation of the effects of this injury is an October of 2010 x-ray of Mr. Robertson's lumbosacral spine that showed normal alignment and vertebral disk heights, no acute fracture, but an osseus defect at L5 consistent with spondylosis.  In November of 2010, Mr. Robertson saw Mr. Goudeau, a physician's assistant, and complained of lower back pain he rated at 4 of 10 which was exacerbated by running, lifting and sit-ups.  A physical examination showed thoracic and lumbar tenderness, but no radiculopathy, negative straight leg raising tests, and normal sensation, motor function, gait, stance and reflexes.

A November 2010  MRI of Mr. Robertson's spine (the only MRI in the record) had the following results: at T4-T5, a small central disk protrusion superimposed upon disk bulging causing effacement of cerebrospinal fluid anterior to the spinal cord; at T5-T6 and T6-T7, posterior disk bulging without significant cord impingement or canal stenosis; at L3-L4, circumferential disk bulging and facet arthropathy; at L4-L5, asymmetric disk bulging or shallow protrusion in right lateral location effacing fat medial to existing right L4 root and minimal contact to the root lateral to the foramen; and at L5-S1, central and right paracentral disk protrusion causing mild contact of arising right S1 root sleeve without significant alteration in the course of the root.

Over the following eight months, Mr. Robertson had periodic treatment for his back pain. He attended three physical therapy appointments in December of 2010, but later stated that he derived little benefit from the therapy.  That same month Mr. Goudeau examined him and noted that Mr. Robertston had thoracic and lumbar spine pain and tenderness, but no radiculopathy or muscle spasms and full range of motion.

In February of 2011, Mr. Robertson saw his treating physician, Dr. Mosura.  He stated that his back and knee pain was 4 of 10 but he was not experiencing leg pain, radiation or numbness.  According to him, his pain impaired his quality of life, including his general activity, mood, ability to walk, ability to work, relation with people, sleep and enjoyment of life.  Dr. Mosura performed a physical evaluation and recorded the following findings: Mr. Robertson's functional assessment was normal and he had no neuro-psychiatric issues; he had a full range of motion and no joint deformity as well as normal coordination, strength, balance, gait and reflexes; he had posterior tenderness and limited range of motion in his spine, but normal coronal and sagittal alignment; and he had negative straight leg tests and exhibited no pain behavior.  Dr. Mosura concluded that he had thoracic and lumbar pain, but no radicular symptoms and no significant spinal stenosis.  He recommended epidural injections in Mr. Robertson's lumbar spine as treatment.  Mr. Robertson agreed to these injections and received two in February, separated by 10 days.

Mr. Robertson returned to Dr. Mosura in March of 2011.  He continued to complain of severe low back pain that greatly affected his quality of life, exacerbated by sitting, standing and walking.  He reported relief with an epidural injection from February, but stated that a second injection made his pain worse.  Physical examination results in March were very similar to those in February, with posterior tenderness and decreased lumbar range of motion, but normal

alignment, negative straight leg tests, no pain behavior and normal gait, strength and balance.  At the end of March, Dr. Mosura gave Mr. Robertson a third epidural injection.

In April of 2011, Mr. Robertson reported to Dr. Mosura that he had less pain (3 of 10) as a result of the third epidural injection.  However, he still experienced moderate to severe quality of life impairment.  The results of a physical examination were consistent those in February and March.

In April, Mr. Robertson was sent by the Army to a Medical Evaluation Board (MEB). Having reviewed his medical records (the same as those summarized herein), the MEB determined that he had herniated disks in his thoracic and lumbar spine, right knee chondromalacia patella and adjustment disorder.  The MEB also determined that these medical problems prevented him from performing the basic duties of a soldier, including direct fire exercises, riding in a Humvee for 12 hours per day, constructing an individual fighting position and moving 2 miles with a combat pack.  Although he was able to keep his pain under control as long as he was not performing the duties of a soldier, he was given a 30% disability rating (10% each for his spine, knee and adjustment disorder impairments) and discharged from the Army effective September 2011.

Between the MEB and his discharge, Mr. Robertson continued to receive medical evaluation and treatment from Dr. Mosura.  In June, Mr. Robertson complained of increased pain (7 of 10 to 10 of 10) in his thoracic spine and neck aggravated by sitting and standing, and relieved by lying down and resting.  Although he had told Dr. Mosura that his March injections helped his back pain, he now stated that these injections caused him more pain and that the impact of this pain on his quality of life was generally severe.  Examination results were, again, very similar to those from the February, March and April.  Mr. Robertson exhibited normal

alignment and muscle strength, negative straight leg raise tests, no posterior tenderness or spasm and no radiation of pain from his lower back.  He did report pain radiating in his neck and had decreased range of motion.

Mr. Robertson saw Dr. Mosura for the last time in July.  He continued to complain of lower back and knee pain that severely impacted his quality of life.  Dr. Mosura's physical examination results were nearly identical to those from the prior four examinations.  Mr. Robertson had normal alignment, strength, balance and gait, no posterior tenderness or muscle spasms, and negative straight leg raise tests.  He still had reduced lumbar spine range of motion and Dr. Mosura concluded that he has failed all interventional procedures and probably need to see a neurosurgeon, although he did recommend continued epidural injections.

During a visit to an Army medical clinic in early July, Mr. Robertson complained of lower back pain and diarrhea.  He had lower back tenderness to palpation and was told a Toradol shot would help his lower back pain and that he should eat a BRAT diet and drink more fluids to help his diarrhea.

Mr. Robertson applied for disability benefits in October of 2011.  As part of his application, he underwent a physical examination by Dr. Mitchell.  He told Dr. Mitchell that he had mid and lower back pain, tingling in the soles of his feet and arthritis in his right knee.  His pain was exacerbated by lifting and bending and eased with sitting, resting, medication and a TENS unit.  In his daily life, he needed help getting in and out of bed, dressing and bathing. Dr. Mitchell examined Mr. Robertson and noted that he climbed on and off the examination table without pain and sat comfortably; he was pleasant, in no acute distress, and was not anxious, agitated or drowsy; he was able to walk on his heels and toes and had normal coordination and gait; his range of motion was somewhat limited in his lumbar spine but normal in his cervical

spine and knees; he had negative straight leg raise tests and no spinal tenderness; he had normal

sensory and strength in his upper and lower extremities, except for reduced reflexes in his patella

tendons.  Based on these findings, Dr. Mitchell concluded that Mr. Robertson was able to: stand

or walk for 4 hours per day; sit for an entire day; occasionally bend, squat, crouch, stoop and

kneel; lift 20 pounds frequently and 40 pounds occasionally; and climb stairs and ladders

occasionally.

After his physical evaluation, Mr. Robertson did not receive any additional healthcare,

save a single emergency room visit in April of 2012.  Mr. Robertson complained of back and

abdominal pain with no radiation of pain to any other body part.  An EKG, chest x-ray and

abdomen ultrasound were all normal.

### B.  Knee Pain

Although Mr. Robertson stated that his knee pain began several years before 2010, the

first medical record documenting his knee problems is an October 2010 x-ray report.  It shows

no evidence of acute fracture, dislocation, effusion, inflammation or arthritis.  Mr. Goudeau's

November 2010 examination showed no swelling, redness, warmth, stiffness, locking, or pain on

motion or instability in Mr. Robertson's right knee.  At that time Mr. Robertson characterized his

knee pain as 1 of 10.  His December 2010 physical therapy appointments included knee

exercises, but there is no evidence of any follow-up or progress.  Mr. Goudeau's December 2010

examination had the same results as the November examination, save for patella femoral

grinding.  During a February 2010 examination his right patella tendon was tender on palpation,

but he again had no swelling, redness, warmth, stiffness or locking.  Finally, during his five

appointments with Dr. Mosura, Mr. Robertson consistently complained of knee pain, but

functional testing showed normal strength, balance, gait and range of motion.

### C. Adjustment Disorder

There is only cursory mention of Mr. Robertson's adjustment disorder in the medical records.  In January of 2011, Mr. Swidle, a nurse, wrote that Mr. Robertson had no depression, suicidal thoughts or other psychological symptoms.  In February of 2011, he reported to a disability evaluator, Dr. Lujan, that he had no depression in the prior two weeks.

At his March and April 2011 appointments with Dr. Mosura, he told the doctor that he was not depressed.  During all five of Dr. Mosura's examinations, Mr. Robertson was oriented with normal insight, judgment and memory.  He exhibited no agitation, anxiety, compulsive behavior, denial, fear, flight of ideas, hopelessness, mood swings, obsessive thoughts, paranoia or suicidal ideation.

In April of 2011, he was examined by Dr. Hayes as part of his MEB.  Dr. Hayes wrote in his treatment notes that Mr. Robertson had no Axis I psychiatric diagnosis or condition.  Based on his observations, Dr. Hayes diagnosed Mr. Robertson with adjustment disorder with anxiety as well as depressed mood.  He wrote that Mr. Robertson had a history of adjustment disorder during times of relationship and family problems, followed by remission.  Finally, he concluded that he had no psychiatric symptoms that precluded him from serving in the military.

Mr. Kurman, a physician's assistant, saw Mr. Robertson in July of 2011 and wrote that he had no psychiatric symptoms.  During an interview conducted for his separation from the Army, Mr. Robertson stated that he had not been seen by a mental health provider in the past, was in no current mental health treatment, took no medication for his mental health and had no desire for future mental health treatment.  When Dr. Mitchell administered a mini-mental status examination in November of 2011, he scored 29 out of 30.

### D.  Mr. Robertson's Testimony

Mr. Robertson testified about his physical and mental impairments, his pain, his medical treatment, his functional limitations and his daily routine.  He testified that he had pain in his mid to lower back and his right knee.  He characterized his pain as constant, dull and aching.  To help with the pain, he relaxes, stretches, used his TENS machine twice a day while lying down and takes pain medication he has left over from his time in the military.  This medication made him sleepy.  He also testified that he had not received any medical treatment since his discharge from the military, save for a single emergency room visit in 2012.  He felt that the strain on his body was greatly reduced since he left the military, where his job demanded 12-14 hours per day of standing.  He first applied for treatment from the Veterans Administration (VA) in July 2012, three weeks prior to the hearing.  Although he stated that he had been depressed in the past, he was not depressed currently and was under no mental health treatment.

Mr. Robertson also testified that his pain affects his relationships and his physical functioning.  His pain makes him angry and affects his concentration and ability to get along with other people.  In the past, he had problems getting along with his supervisors while in the military because he disagreed with their expectations.  He also testified that he must stand up and stretch every 30 to 45 minutes when sitting and spend 10 to 15 minutes stretching and walking. He felt he could stand in one place for 30 minutes at a time and walk up to a quarter mile at a time.  Additionally, he stated that he was able to lift 20 to 25 pounds occasionally and 10 to 15 pounds frequently.

During the day, he relaxed, watched television, looked for jobs on the internet, did some laundry, cooking and cleaning (but tries not to bend at the waist), drove, shopped and cared for his dog.  During his examination with Dr. Mitchell, he stated that he drove around with his friend

to pick up scrap metal and drop it off at a scrap yard.  He testified that he did not feel he could work full time, but might be able to work 4 to 6 hours per day.

### E.  The Vocational Expert's Testimony

At the end of the hearing, the ALJ and Mr. Robertson's attorney asked the vocational expert several hypothetical questions.  In response to a hypothetical question from the ALJ that included the same limitations found in the ALJ's RFC finding, the vocational expert testified that a person with those limitations would be able to work as a telemarketer, appointment clerk and information clerk.

### III.    Issues Presented

Mr. Robertson raises five challenges to the Commissioner's Decision: (1) the ALJ's finding that Mr. Robertson's impairments did not medically equal Listing 1.04 was not supported by substantial evidence; (2) the ALJ's RFC finding was not supported by substantial evidence because the ALJ did not consider Mr. Robertson's mental impairment or his need for frequent breaks during the day so that he can walk around, lie down and use his TENS unit; (3) the ALJ did not give adequate weight to Mr. Robertson's treating physicians and the VA Disability Determination; (4) the ALJ's credibility determination was not based on substantial evidence; and (5) the ALJ's Step 5 finding was not based on substantial evidence.  The Court will address each challenge in turn.

### IV.    Standard of Review

Judicial review of the Commissioner of Social Security's determination that a claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003); 42 U.S.C.

§ 405(g).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  It requires more than a scintilla, but less than a preponderance.  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  On appeal, a reviewing court's job is neither to "reweigh the evidence nor substitute our judgment for that of the agency."  *Branum v. Barnhart*, 385 f.3d 1268, 1270, 105 Fed. Appx. 990 (10th Cir 2004) (*quoting Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

An impairment is medically equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 1526(a).  If a claimant has an impairment that is described in the Listings and the claimant exhibits all of the criteria specified in that Listing, but one or more of the findings is not as severe as specified in the particular Listing, the claimant's impairment is medically equivalent to that Listing if the claimant has other findings related to his or her impairment that are at least of equal medical significance to the required criteria.  *Avery v. Astrue*, 313 Fed.Appx. 114, 122 (10th Cir. 2009) (citing 20 C.F.R. § 404.1526).  Similarly, if a claimant has a combination of impairments, none of which individually meet a Listing, the claimant's impairments are compared with closely analogous listed impairments and if the claimant's impairments are at least of equal medical significance to those of a listed impairment, the combination of impairments is medically equivalent to a Listing.  *Id.*

At Step 3, the claimant bears the burden of showing that one or more impairments matches a listed impairment.  *Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007).  The claimant must provide specific medical findings that support each of the various requisite criteria for the listed impairment.  *Id.*  "For a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those

criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

The ALJ is required at Step 3 to discuss the evidence and explain why a claimant does not meet a listed impairment. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). Although the ALJ does not have to discuss every piece of evidence, in addition to discussing the evidence supporting his or her decision, the ALJ also must discuss the uncontroverted evidence he or she chooses not to rely upon, as well as significantly probative evidence he or she rejects. *Id*. at 1010. However, "[h]armless error analysis 'may be appropriate to supply a missing dispositive finding … where, based on material the ALJ did at least consider (just not properly), we [the court] could confidently say that no reasonable administrative fact finder, following the correct analysis, could have resolved the factual matter in any other way.'" *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir. 2005) (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)).

When evaluating medical opinions, a treating physician's opinion must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give specific and legitimate reasons to reject a treating physician's opinion or give it less than controlling weight. *Drapeau v. Massanari*, 255 F.3d 1211 (10th Cir. 2001). Even if a treating physician's opinion is not entitled to controlling weight, it is entitled to deference and must be weighed using the following factors:

> 1) the length of the treatment relationship and the frequency of examination;
> 2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; 3) the degree to which the physician's opinion is supported by relevant evidence; 4) consistency between the opinion and the record as a whole; 5) whether or not the physician is a

> specialist in the area upon which an opinion is rendered; and 6) other factors
> brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins*, 350 F.3d at 1300-01 (citation omitted); 20 C.F.R. § 404.1527.

Having considered these factors, the ALJ must give good reasons in the decision for the weight assigned to a treating source's opinion. *Id.* The ALJ is not required to explicitly discuss all the factors outlined in 20 C.F.R. § 404.1527. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, the reasons the ALJ sets forth must be sufficiently specific to make clear to subsequent reviewers the weight the ALJ gave to the treating source's medical opinions and the reason for that weight. *Watkins*, 350 F.3d at 1301.

At Step 4 in the disability analysis, the ALJ is also required to assess a claimant's RFC based on all relevant evidence, medical or otherwise. 20 C.F.R. § 416.1545. As part of this evaluation, the ALJ must take into consideration all the claimant's symptoms, including subjective symptoms. 20 C.F.R. § 416.1529(a). Subjective symptoms are those that cannot be objectively measured or documented. One example is pain, but there are many other symptoms which may be experienced by a claimant that no medical test can corroborate. By their nature, subjective symptoms are most often identified and described in the testimony or statements of the claimant or other witnesses.

In assessing subjective symptoms, the ALJ must consider statements of the claimant relative to objective medical evidence and other evidence in the record. 20 C.F.R. § 416.1529(c)(4). If a claimant has a medically determinable impairment that could reasonably be expected to produce the identified symptoms, then the ALJ must evaluate the intensity, severity, frequency, and limiting effect of the symptoms on the claimant's ability to work. 20 C.F.R. § 416.1529(c)(1); SSR 96-7p.

In the 10th Circuit, this analysis has three steps: 1) the ALJ must determine whether there is a symptom-producing impairment established by objective medical evidence; 2) if so, the ALJ must determine whether there is a "loose nexus" between the proven impairment and the claimant's subjective symptoms; and 3) if so, the ALJ must determine whether considering all the evidence, both objective and subjective, the claimant's symptoms are in fact disabling.  *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987).[2]  The third step of the *Luna* analysis involves a holistic review of the record.  ALJ must consider pertinent evidence including a claimant's history, medical signs, and laboratory findings, as well as statements from the claimant, medical or nonmedical sources, or other persons.  20 C.F.R. § 416.1529(c)(1).  In addition, 20 C.F.R. § 416.159(c)(3) instructs the ALJ to consider:

> 1) [t]he individual's daily activities; 2) [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) [f]actors that precipitate and aggravate the symptoms; 4) [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms…; and 7) [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Inherent in this review is whether and to what degree there are conflicts between the claimant's statements and the rest of the evidence.  *Id*.  Ultimately, the ALJ must make specific evidentiary findings with regard to the existence, severity, frequency, and effect of the subjective symptoms on the claimant's ability to work.  20 C.F.R. § 416.1529(c)(4).  This requires specific evidentiary findings supported by substantial evidence.  *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988); *Diaz*, 898 F.2d at 777.

---

[2]  The ALJ need not follow a rote process of evaluation, but must specify the evidence considered and the weight given to it.  *Qualls v. Apfel*, 206 F3d 1368, 1372 (10th Cir. 2000).

## V.      Discussion

All of Mr. Robertson's challenges to the Commissioner's Decision are based on the same basic argument: that the ALJ's findings are not supported by substantial evidence.  The Court disagrees.

### A.  Step 3

At Step 3, the ALJ found that "[t]he evidence of back and knee changes does not establish the degree of joint deformity, nerve damage, muscle weakness, and inability to ambulate or use the arms effectively that is required to meet Listing 1.00 ff. for orthopedic impairments (Exhs. 2F; 4F)."  The ALJ did not discuss Listing 1.04, Disorders of the Spine, at Step 3.  Mr. Robertson argues that this is error, as his medical records establish that his impairments were medically equivalent to Listing 1.04.[3]

Although Mr. Robertson is correct that the ALJ should have discussed Listing 1.04 at Step 3, failure to do so was harmless.  In order to meet or medically equal Listing 1.04, a claimant must establish one of three conditions: (A) nerve root compression, (B) spinal arachnoiditis or (C) lumbar spinal stenosis resulting in pseudoclaudication.  20 C.F.R. Part 404, Subpt. P, Appx. 1.  The medical evidence does not show that Mr. Robertson's impairments met any of these conditions.

Nerve root compression involves "neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness)

---

[3] In the Summary of Arguments section of his Brief (**#15**), Mr. Robertson argues that the ALJ erred by failing to obtain the opinion of a medical expert on the issue of equivalency, as required by SSR 96-6p.  However, he does not elaborate on this argument in the remainder of his Brief. Although the Court questions whether this cursory argument is sufficient to raise the issue, *see Wall v. Astrue*, 561 F.3d 1048, 1065 (10th Cir. 2009), the Court concludes that any error in failing to obtain an expert medical opinion on the issue of equivalency was harmless.  *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir. 2005).  As explained herein, the evidence does not support a finding that Mr. Robertson's impairments, whether physical or psychological, met or were medically equivalent to any Listing.

accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive

straight-leg raising test (sitting and supine)." *Id*. Although the ALJ did not discuss Listing 1.04

at Step 3, the ALJ did discuss several of these factors elsewhere in the Decision.  The ALJ wrote

"…provocative tests for nerve root impingement (straight leg raise tests) were negative, [and]

there were no findings of weakness or neurological abnormality with regards to the spine…."

Decision at 6.  This observation was supported by the record.  Dr. Mosura repeatedly wrote in his

2011 treatment notes that Mr. Robertson had no radiculopathy, normal strength and negative

straight leg raise tests.  The November 2010 MRI does not show nerve root compression.  Mr.

Goudeau's examinations also showed no radiculopathy and negative straight leg raise tests.

Additionally, there were no other impairments or medical problems documented in the record

that mirror these missing symptoms.

The medical record also does not reflect a diagnosis of spinal arachnoiditis or spinal

stenosis.  The November 2010 MRI showed herniated disks, but no spinal arachnoiditis or

stenosis.  X-rays of Mr. Robertson's spine also did not indicate either condition.  Given the

above medical evidence, there is little support in the record for Mr. Robertson's argument that

his impairments met or medically equaled Listing 1.04.  Consequently, the ALJ's failure to

discuss this Listing at Step 3 was harmless error.  *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734

(10th Cir. 2005).

**B.  RFC**

In his second, third and fourth challenges, Mr. Robertson dispute a number of findings

the ALJ made in determining the RFC.  He argues that the ALJ failed to include concentration or

social limitations in the RFC, failed to order a consultative examination for his mental

impairments, failed to adequately discuss his need for frequent breaks, did not adequately

evaluate his credibility, and did not give appropriate weight to the VA Disability Determination or his treating doctors.

### 1.  The VA Disability Determination and Mr. Robertson's Treating Physicians

In the Decision, the ALJ specifically considered the VA Disability Determination.  The ALJ treated it as a medical opinion but gave it no weight because it did not provide specific functional limitations applicable to civilian employment.  Mr. Robertson argues that the ALJ should have considered the VA's determination, evaluated it using the factors found in 20 C.F.R. § 404.1527 and, at the very least, inquired into the evidence the VA used to make their determination.

As noted, the ALJ treated the VA's Disability Determination as a medical opinion. The ALJ also gave a sufficient reasons for giving the Determination no weight.  Although the VA determined that Mr. Robertson had a 30% disability rating (10% for each for his spine, knee and adjustment disorder), the Determination did not include details as to how this disability prevented Mr. Robertson from performing civilian work.  Rather it focused on performance of duties as a soldier. In addition, it found that Mr. Robertson was able to keep his pain under control as long as he was not called upon to handle the physical rigors of combat, including digging, marching with a heavy pack, and sitting in a Humvee for 12 hours per day. In the absence of a correlation of these limitations to functional limitations for everyday civilian life, ALJ was justified in concluding that the Determination provided little insight into Mr. Robertson's limitations to work.

Mr. Robertson contends that the ALJ should have inquired into the basis of the VA's Determination.  It is unclear what such inquiry would have accomplished.  In the September 24,

2011 Rating Decision, the VA specifically cited to Mr. Robertson's medical record, including treatment records up through April of 2011.  Most of these records (in particular those from October 2010 to April 2011) are part of the record associated with Mr. Robertson's disability application, were reviewed by the ALJ and specifically mentioned in the Decision.

### 2.  Mr. Robertson's Credibility

After consideration of the evidence and Mr. Robertson's statements regarding his subjective symptoms, the ALJ found that Mr. Robertson's impairments could be expected to cause his symptoms, but that "his statements concerning the intensity, persistence and limiting effects of these symptoms and his allegedly restricted daily activities are not well supported by the evidence."  Mr. Robertson's primary objection to the ALJ's credibility analysis is the ALJ's reference to his failure to pursue treatment.

When weighing a claimant's statements regarding his or her subjective symptoms, the ALJ must follow the three-part *Luna* analysis, codified in 20 C.F.R. § 404.1529.  Here, the ALJ's analysis followed the requirements of *Luna*.  As noted above, the ALJ found that Mr. Robertson had several impairments that could be expected to cause his subjective symptoms.  The ALJ then considered the entire record, particularly the medical evidence, before finding that Mr. Robertson's statements about his subjective symptoms were not fully credible.  In particular, the ALJ considered Mr. Robertson's treatment with physical therapy, injections and medications, Dr. Mosura's treatment notes, Dr. Mitchell's examination report and his failure to pursue treatment after he was discharged from the military.

The ALJ's credibility finding is supported by the medical evidence.  Dr. Mosura and Dr. Mitchell's examinations support the functional limitations greater than those Mr. Robertson alleges.  The only functional limitations either doctor found were reduced range of motion in the

back and occasional muscle tenderness to palpation.  However, Mr. Robertson repeatedly had no problem with his strength, alignment, gait or balance.  Similarly, he did not display pain behavior and Dr. Mitchell noted that he moved with no limitation during the November 2011evaluation.

The evidence also supports the ALJ's reliance upon Mr. Robertson's lack of treatment following discharge from the military.  During the hearing, Mr. Robertson was asked by his attorney why he had not pursued medical treatment since his discharge.  Mr. Robertson replied, essentially, that he did not need medical care now that he was out of the military.  According to his testimony, his daily routine, which included relaxing for several hours at home but also looking for a job and driving around with his friend looking for scrap metal, did not cause the type of pain that 12-14 hours on his feet (the requirements of his military duties) caused.  Mr. Robertson also testified that he did not apply to the VA for medical treatment until early July of 2012, eleven months after his discharge from the military.  Although he testified that he was waitlisted with the VA for treatment, he did not explain why he waited 11 months to apply. Given Mr. Robertson's testimony, the ALJ reasonably inferred that his symptoms were not as severe as he stated.  Combined with the medical evidence in the record, Mr. Robertson's lack of treatment forms substantial evidence which supports the limited weight the ALJ gave to Mr. Robertson's statements about his subjective symptoms.

### 3.  The Need For Additional Limitations and Examinations

There is little to no evidence in the record, save for Mr. Robertson's hearing testimony, to support the inclusion of additional concentration, social or physical limitations in the RFC, nor does the medical evidence support sending Mr. Robertson to a mental health consultation.

As the ALJ observed in the Decision, Mr. Robertson received little to no treatment for his adjustment disorder (or any other mental health problem) and the Medical records consistently

showed him to be oriented with normal insight, judgment and memory.  During Dr. Mosura's

examinations, Mr. Robertson exhibited no agitation, anxiety, compulsive behavior, denial, fear,

flight of ideas, hopelessness, mood swings, obsessive thoughts, paranoia or suicidal ideation.  He

scored 29 out of 30 on a November 2011 mini-mental status examination.  While he was irritable

on one occasion in February of 2011, there is no indication that this irritability caused long-term

limitations in social interaction.  At the hearing, Mr. Robertson testified that he was not

depressed, and he told Army medical personnel that he did not need or want mental health

treatment.

Given the above evidence, along with the lack of any treatment records for mental health

issues and Mr. Robertson's own statements that he did not need or want mental health treatment,

the omission of concentration or social limitations from the RFC was supported by substantial

evidence.  Additionally, the lack of evidence supporting these limitations, or any severe mental

impairment, vitiated any need for a mental health examination.

Mr. Robertson also argues that the ALJ should have accommodated his need for frequent

breaks to use his TENS machine and take walks.  However, as with his stated need for additional

mental limitations, the evidence in the record does not support these physical limitations.   As the

Court has already noted, neither Dr. Mosura nor Dr. Mitchell's examinations showed significant

functional limitations, save for some back tenderness and limited lumbar range of motion.

Additionally, the ALJ's RFC finding accommodates those few functional limitations the medical

evidence does support, including limits on walking, lifting and bending.

## C.  Step 5

At Step 5, the ALJ found that Mr. Robertson was able to perform several jobs in the

national economy.  This finding was based upon the testimony of a vocational expert, who

answered several hypothetical questions posed by both the ALJ and Mr. Robertson's attorney. Mr. Robertson argues that the ALJ's Step 5 finding was not supported by substantial evidence, as the hypothetical the ALJ asked the vocational expert (the answer to which formed the basis for the ALJ's Step 5 finding) did not relate with precision all of Mr. Robertson's impairments.

Because the ALJ's RFC finding was without error and supported by substantial evidence, it follows that the ALJ was not required to include any further limitations outside of those listed in the RFC finding. *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995). As the ALJ's hypothetical question to the vocational expert matched the RFC finding in the Decision, the vocational expert's response to that question was substantial evidence upon which the ALJ appropriately based the Step 5 finding.

For the forgoing reasons, the Commissioner of Social Security's decision is **AFFIRMED.** The Clerk shall enter a Judgment in accordance herewith.

DATED this 28th day of January, 2014.

**BY THE COURT:**

Marcia S. Krieger
United States District Judge